Sally Qualls MERCER, et al.

v.

VANDERBILT UNIVERSITY,
INC., et al.

Supreme Court of Tennessee,
at Nashville.

Oct. 3, 2003 Session, Heard
at Murfreesboro.[1]

May 3, 2004.

1. Oral argument was heard in this case on October 3, 2003, in Murfreesboro, Rutherford County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

Clinton L. Kelly and F. Dulin Kelly, Hendersonville, Tennessee, for the appellant-plaintiff, Sally Qualls Mercer.

G. Brian Jackson, Robert J. Walker, and Steven E. Anderson, Nashville, Tennessee, for the appellee-defendant, Vanderbilt University, Inc.

Robyn E. Smith and William B. Hubbard, Nashville, Tennessee, for the amicus curiae, Tennessee Hospital Association.

## OPINION

JANICE M. HOLDER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and WILLIAM M. BARKER, JJ., joined.

We granted this appeal, in part, to determine whether fault was properly assessed against the patient in this medical malpractice action. We overrule *Gray v. Ford Motor Co.*, 914 S.W.2d 464 (Tenn. 1996), and hold that fault may not be assessed against a patient in a medical malpractice action in which a patient's negligent conduct provides only the occasion for the medical attention, care, or treatment which is the basis for the action. We also hold that the additional issues raised by the defendant are without merit. We therefore affirm the trial court's post-trial ruling that the defendant is 100% at fault and is responsible for the full amount of damages found by the jury.

### Factual and Procedural Background

In the early morning hours of May 30, 1998, Larry T. Qualls was seriously injured in a single-vehicle accident in which he sustained a mild-to-moderate concussion and multiple facial fractures. Upon arriving at the trauma center at Vanderbilt University Medical Center ("Vanderbilt") nearly four hours after the accident, Qualls had a blood alcohol level of .13%, which extrapolated to approximately .20% at the time of the accident. Qualls was connected to a ventilator to assist his breathing and remained on a ventilator while at Vanderbilt. Dr. Timothy Van Natta, Qualls's treating trauma surgeon, admitted Qualls to the neuro-intensive care unit for observation.

Over the next two days, Qualls remained in stable condition but suffered from "severe agitation." Dr. Van Natta attributed this agitation to alcohol withdrawal. Qualls was given unusually large doses of Valium, Fentanyl, and other drugs to keep him sedated.

On June 2, 1998, Qualls's fourth day at Vanderbilt, he continued to show signs of alcohol withdrawal and received large doses of medication to control his agitation. CT scans were ordered that day in preparation for reconstructive surgery to treat his facial fractures. At approximately 10:20 p.m., Linda Starks, a registered nurse, Karita Turner, a respiratory therapist, and Peggy Fowler, a nurse's aide, prepared to transport Qualls from the neuro-intensive care unit to the CT suite.

Qualls was connected to a portable cardiac monitor and to a portable ventilator. The ventilator was attached to one of three portable oxygen tanks that accompanied Qualls to the CT suite. One of the tanks was full, and the remaining tanks were half-full. Ms. Turner did not record the portable ventilator's settings and alarm parameters prior to leaving the neuro-intensive care unit. Nurse Starks did not verify the alarms or the parameters on Qualls's portable cardiac monitor and did not make any entry in his medical record of either the alarm parameters or Qualls's vital signs.

Upon arriving at the CT suite at approximately 10:30 p.m., Nurse Starks administered a paralytic drug to Qualls in prepa-

ration for the CT scans. As a result, Qualls was unable to move or breathe on his own and became completely dependent on the portable ventilator. Nurse Starks never informed the other health care providers that she had given Qualls the drug.

Qualls was then moved from his hospital bed to the CT table. After Qualls was secured on the table, Nurse Starks, Ms. Turner, and the CT technician, Wayman Bean, moved to the adjoining control room, and Ms. Fowler returned to the neuro-intensive care unit to obtain fresh linens for Qualls's bed.

From the control room, Nurse Starks and Ms. Turner could see the CT table through a glass window and could observe Qualls's face on a television monitor. Neither of them looked at the cardiac monitor or the ventilator while Qualls was in the CT scanner. Nurse Starks testified that she was watching Qualls's face and was listening for alarms. Both she and Ms. Turner testified that no alarms ever sounded, either during or after Qualls's CT scans.

Mr. Bean took three scans of Qualls's face. The first scan was taken at 10:47 p.m., and the last scan was taken at 10:56 p.m. After the scans were completed, Mr. Bean retracted the table from the scanner, and Nurse Starks and Ms. Turner prepared to move Qualls back to his bed. All three testified that Qualls's complexion was "pink" and that he was breathing when he came out of the scanner.

Shortly after Qualls was moved to his bed, however, someone noticed that he had turned gray and was not breathing. Nurse Starks and Ms. Turner looked at the cardiac monitor and discovered that Qualls's heart had stopped. Nurse Starks and Ms. Turner disconnected Qualls from the ventilator and immediately began administering CPR. Ms. Fowler called a "code" for additional personnel at approxi-

mately 11:05 p.m., and within minutes, the "code team" arrived and took over the resuscitation effort.

Although Qualls was successfully resuscitated, he sustained severe and permanent brain damage. Prior to his discharge from Vanderbilt, Qualls's facial fractures were successfully treated. Since his discharge, Qualls has been a patient at NHC Healthcare, a skilled nursing facility in Dickson, Tennessee, and has remained in a persistent vegetative state.

The pending medical malpractice action was filed by Qualls's sister, Sally Qualls Mercer, who was appointed as conservator for her brother. The plaintiff's theory at trial was that Ms. Turner attached the ventilator to an oxygen tank that was only half-full and that the tank ran out of oxygen during the CT scans, that Nurse Starks and Ms. Turner failed to appropriately monitor Qualls during the procedure, and that they either failed to activate or turned off the alarms on the cardiac monitor and the portable ventilator.

At trial, Vanderbilt admitted that Nurse Starks had violated the applicable standard of care in her treatment of Qualls on the night in question. However, Vanderbilt asserted that her violation of the standard of care was not the cause of Qualls's permanent brain injury. Instead, Vanderbilt's theory was that Qualls suffered a catastrophic event, such as a seizure or a malignant heart arrhythmia, which was caused by his alcohol withdrawal. Vanderbilt contends that it was this event that caused Qualls's brain injury.

At the conclusion of the proof, the plaintiff moved for a directed verdict on the issue of comparative fault. The plaintiff argued that the holding in *Gray v. Ford Motor Co.*, 914 S.W.2d 464 (Tenn.1996), did not apply because Qualls's permanent brain injury was separate and distinct

from the injuries that resulted from the accident he caused by driving under the influence and therefore asserted that the jury should not be allowed to apportion *any* fault to him. The trial court denied the plaintiff's motion and submitted the case to the jury.

The jury returned a verdict in favor of the plaintiff, setting damages in the amount of $7,366,000. The jury apportioned 70% of the fault to Vanderbilt and 30% of the fault to Qualls. Based on the jury's verdict, the trial court entered an order of judgment awarding the plaintiff $5,156,200.

The plaintiff filed a motion pursuant to Rule 50.02 of the Tennessee Rules of Civil Procedure, seeking a judgment entered in accordance with the plaintiff's motion for directed verdict and requesting the trial court to enter a judgment for $7,366,000, the full amount of damages found by the jury. Vanderbilt filed a motion for a new trial or, alternatively, for remittitur. In its motion, Vanderbilt asserted that: 1) the trial court erred in excluding evidence of Qualls's prior alcohol-related conduct; 2) the trial court erred in excluding the testimony of Dr. John Salyer, a treating physician, and Jim Hutchison, a biomedical engineer; 3) the trial court erred in excluding expert testimony on the subject of the cost of an annuity to cover Qualls's future medical care; and 4) the trial court improperly commented on the evidence by stating in the presence of the jury that Ms. Fowler was a "hostile witness" who was "changing her testimony." Vanderbilt also raised other issues that are not pertinent to this appeal.

The trial court denied Vanderbilt's motions but granted the plaintiff's Rule 50.02 motion. The court ruled that the injury sustained by Qualls on June 2, 1998, was, as a matter of law, a separate and distinct injury for which Qualls was not at fault.

The court therefore ruled that Vanderbilt was 100% at fault and entered a judgment against Vanderbilt for the full amount of the damages found by the jury.

The Court of Appeals held that the trial court erred in granting the plaintiff's Rule 50.02 motion. The intermediate appellate court also reversed the trial court as to the first three issues listed above but held that the trial court's comment as to Ms. Fowler, though improper, did not warrant reversal. The Court of Appeals therefore reversed the judgment of the trial court and remanded the case for a new trial.

We granted permission to appeal.

## Analysis

### I. Trial Court's Ruling on Plaintiff's Rule 50.02 Motion

#### A. Comparative Fault

■ The first issue we must address in this appeal is the propriety of the trial court's ruling that Vanderbilt was 100% at fault and therefore responsible for the full amount of the damages found by the jury. The plaintiff argues that the jury should not have been charged on the issue of comparative fault. Specifically, the plaintiff contends that this Court's holding in *Gray v. Ford Motor Co.*, 914 S.W.2d 464 (Tenn.1996), does not control this case. While we acknowledge that the present case could be distinguished from *Gray*, we are convinced that the need for clarity in this area of the law requires a reexamination of the underpinnings of *Gray* and its continued viability.

In *Gray*, the plaintiff's decedent was involved in a single-vehicle accident that was caused by her negligent operation of an automobile while under the influence of alcohol. 914 S.W.2d at 465. As a result of the accident, the decedent sustained a ruptured spleen. *Id.* at 465–66. The dece-

dent's injury was negligently misdiagnosed by her treating physician and ultimately led to her death. *Id.* The plaintiff brought a wrongful death action, claiming that the decedent's death was proximately caused by the physician's negligence in treating the decedent's injury. *Id.* at 465. In its opinion, this Court reaffirmed its holding in *Volz v. Ledes*, 895 S.W.2d 677 (Tenn. 1995), and held that the principles of comparative fault apply in medical malpractice actions, thus permitting the apportionment of fault between a patient who acts negligently in causing his or her initial injury and a physician who acts negligently in the treatment of the patient for that injury. *Id.* at 467. The Court concluded, without analysis, that the decedent suffered an indivisible injury and limited the scope of *Gray's* holding to cases in which "[t]here [is] one indivisible injury proximately caused by the separate, independent acts of the [patient] and the physician." *Id.* The Court explicitly stated that "[t]his case does not present, and the Court declines to address in this opinion, the rights and liabilities of the parties where there are multiple, separate injuries." *Id.* The Court gave no analytical framework for the adoption of this distinction or for its implied premise that its holding was a necessary consequence of *Volz*.

In the present case, we find that this indivisible/separate injury distinction defies meaningful application. The plaintiff makes a strong argument that Qualls's brain injury was separate and distinct from the injuries he sustained in the automobile accident. The plaintiff acknowledges that the mild-to-moderate concussion and facial fractures that Qualls sustained in the automobile accident were a result of his own negligence. However, the plaintiff argues that the brain injury that left Qualls in a persistent vegetative state occurred nearly four days after Qualls was admit-

ted to Vanderbilt and was not a result of the accident or any negligence on Qualls's part. An equally strong argument, however, could be made that Qualls suffered one, indivisible injury. Qualls's negligence caused his facial fractures, and the incident that resulted in his brain injury occurred during the treatment of those fractures. Similarly, in *Gray*, the Court's conclusion that the decedent had sustained an indivisible injury evidently was based on the fact that the decedent's own negligence had caused the very injury that the physician negligently misdiagnosed. However, a valid argument could be made that the decedent suffered two separate injuries: her ruptured spleen, which was caused by her negligent operation of a motor vehicle, and her death, which was caused by her physician's negligent misdiagnosis of her ruptured spleen.

Significantly, no other jurisdiction appears to utilize this indivisible/separate injury approach in determining whether principles of comparative fault or contributory negligence apply to medical malpractice actions. To the contrary, most jurisdictions have held that a patient's negligence that provides only the occasion for medical treatment may not be compared to that of a negligent physician. *See, e.g., Harvey v. Mid–Coast Hosp.*, 36 F.Supp.2d 32 (D.Me.1999) (holding that patient's intentional or negligent ingestion of a drug may not be compared with the defendant physician's subsequent, negligent treatment); *Shinholster v. Annapolis Hosp.*, 255 Mich.App. 339, 660 N.W.2d 361 (2003) (holding that patient's failure to regularly take her blood pressure medication in the year before her death could not be compared with the defendant physician's negligent treatment and diagnosis of her condition); *Harding v. Deiss*, 300 Mont. 312, 3 P.3d 1286 (2000) (holding

that patient's negligence in riding a horse when she had asthma and was allergic to horses could not be compared to the defendant physician's failure to immediately intubate her upon her arrival at the hospital); *Jensen v. Archbishop Bergan Mercy Hosp.,* 236 Neb. 1, 459 N.W.2d 178 (1990) (holding that patient's failure to lose weight could not be compared with defendant physician's negligence); *Eiss v. Lillis,* 233 Va. 545, 357 S.E.2d 539 (1987) (holding that patient's negligent ingestion of aspirin and heart medication could not be compared with the defendant physician's negligence). Several of these jurisdictions have concluded that a patient's negligence in causing a motor vehicle accident may not be compared with the defendant physician's subsequent, negligent treatment of the injuries that the patient sustained in the accident. *See, e.g., Martin v. Reed,* 200 Ga.App. 775, 409 S.E.2d 874 (1991); *Fritts v. McKinne,* 934 P.2d 371 (Okla.Ct.App.1996); *Sendejar v. Alice Physicians & Surgeons Hosp. Inc.,* 555 S.W.2d 879 (Tex.Civ.App.1977); *Rowe v. Sisters of the Pallottine Missionary Soc'y,* 211 W.Va. 16, 560 S.E.2d 491 (2001). These jurisdictions conclude that a health care provider may not reduce or avoid liability for negligent treatment by asserting that the patient's injuries were originally caused by the patient's own negligence. The Restatement of Torts reiterates this view. According to the Restatement, "in a case involving negligent rendition of a service, including medical services, a factfinder does not consider any plaintiff's conduct that created the condition the service was employed to remedy." Restatement (Third) of Torts: Apportionment of Liability § 7 cmt. m (2000). The reporter's note to this comment explains that it would be unfair to allow a defendant doctor to complain about the patient's negligence because this negligence caused the very condition the doctor undertook to treat. Restatement (Third) of Torts: Apportionment of Liability § 7 reporter's note to cmt. m (2000).

A majority of jurisdictions have allowed a patient's fault to be considered in medical malpractice cases only under very limited circumstances. *See Fritts,* 934 P.2d at 374. For example, some jurisdictions have allowed juries to apportion fault to a patient who delays in seeking or returning for medical treatment, *see LeBlanc v. N. Colfax County Hosp.,* 100 N.M. 494, 672 P.2d 667, 669–70 (1983), who fails to follow a physician's advice or instructions, *see Musachia v. Rosman,* 190 So.2d 47, 50 (Fla.Dist.Ct.App.1966), who furnishes false, incomplete, or misleading information to his or her physician, *see Rochester v. Katalan,* 320 A.2d 704, 708 (Del.1974), or who attempts to treat his or her own injury before seeking medical attention, *see Sales v. Bacigalupi,* 47 Cal.App.2d 82, 117 P.2d 399, 402 (1941). In *Volz v. Ledes,* this Court upheld the jury's allocation of fault to the patient who delayed in returning for a follow-up examination with his physician. 895 S.W.2d 677, 678, 680 (Tenn.1995). As such, *Volz* falls into the category of cases in which a patient delays seeking or returning for medical treatment. Consequently, our decision in *Volz* did not dictate the result in *Gray,* and *Volz* does not control the present case.

■ Although we recognize that *Gray* is supported by the principle of stare decisis, we conclude that the majority of jurisdictions have adopted the better-reasoned view. As one court has aptly stated,

It would be anomalous to posit, on the one hand, that a health care provider is required to meet a uniform standard of care in its delivery of medical services to all patients, but permit, on the other hand, the conclusion that, where a breach of that duty is established, no

liability may exist if the patient's own preinjury conduct caused the illness or injury which necessitated the medical care.

*Harvey*, 36 F.Supp.2d at 38. We also agree that " 'patients who may have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent treatment is not afforded.' " *Fritts*, 934 P.2d at 374 (quoting *Martin*, 409 S.E.2d at 877). We therefore hold that a patient's negligent conduct that occurs prior to a health care provider's negligent treatment and provides only the occasion for the health care provider's subsequent negligence may not be compared to the negligence of the health care provider. To the extent that *Gray* holds otherwise, it is hereby overruled.

In the present case, Qualls's negligence merely provided the occasion for the medical care, attention, and treatment that gave rise to this medical malpractice action. We therefore hold that the principles of comparative fault do not apply so as to allow fault to be assessed to Qualls. We recognize that Qualls's medical treatment was complicated by his alcohol withdrawal and that evidence concerning his alcohol consumption was clearly relevant to his treatment and to Vanderbilt's theory of causation. We hold, however, that Qualls's antecedent negligence should not have been considered by the jury in assessing fault.

**2.** Rule 50.02 provides,
Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 30 days after the entry of

### B. Tennessee Rule of Civil Procedure 50.02

After receiving the jury's verdict, which apportioned 30% of the fault to Qualls, the trial court granted the plaintiff's Rule 50.02 motion and ruled that Vanderbilt was 100% at fault. In accordance with this ruling, a judgment was entered against Vanderbilt for the full amount of the damages found by the jury. We now must evaluate the trial court's ruling on the motion for judgment in accordance with the plaintiff's motion for directed verdict. Under Rule 50.02, if a motion for directed verdict is not granted, the case is deemed to have been submitted to the jury subject to a later determination of the legal questions raised by the motion. *See* Tenn. R. Civ. P. 50.02.[2] Therefore, when the jury's verdict rests upon an error of law, a party who has moved for a directed verdict may request the trial court to set aside the verdict and enter a judgment in accordance with the party's motion for directed verdict. *See id.*

In ruling on such a motion, the standard applied by both the trial court and the appellate court is the same as that applied to a motion for directed verdict made during trial. *See Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn.1977); *Mairose v. Fed. Express Corp.*, 86 S.W.3d 502, 511 (Tenn.Ct.App.2001). Therefore, the trial court and appellate court are required to take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion when there

judgment a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict....
Tenn. R. Civ. P. 50.02.

is any doubt as to the conclusions to be drawn from the evidence. *See Williams v. Brown,* 860 S.W.2d 854, 857 (Tenn.1993). A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion. *See id.*

■ Having held that the principles of comparative fault do not apply to the present case, we conclude that the trial court acted properly in ruling that Vanderbilt was 100% at fault and therefore responsible for the full amount of the damages found by the jury. By assessing Vanderbilt 70% of the fault, the jury clearly found that Vanderbilt's negligence caused Qualls's brain injury. Because Qualls's antecedent negligence cannot be considered, the trial court did not err in removing the jury's finding of fault against him, leaving Vanderbilt as the sole, remaining cause of Qualls's injuries. As such, the trial court's actions were not a "reallocation" of fault in contravention of our holding in *Turner v. Jordan,* 957 S.W.2d 815, 824 (Tenn.1997). Furthermore, the court was not exercising its role as thirteenth juror. A trial court exercises its authority as thirteenth juror when it finds that the verdict is contrary to the weight of the evidence, as opposed to being based upon an error of law. *See Turner,* 957 S.W.2d at 823; *James E. Strates Shows, Inc. v. Jakobik,* 554 S.W.2d 613, 615 (Tenn.1977). Here, the trial court was ruling on a valid Rule 50.02 motion and adjusted a verdict that was based on an error of law in accordance with that rule.

II. Prior Alcohol–Related Conduct

■ In addition to the issue of comparative fault, Vanderbilt advances many of the issues that it raised in its Motion for New Trial. The first of these issues involves the trial court's exclusion of evidence regarding Qualls's alcohol-related conduct prior to his May 30, 1998 accident. Specif-ically, the trial court excluded evidence of the following two incidents. First, on April 13, 1996, a Lewis County Sheriff's Deputy saw Qualls erratically operating a motor vehicle. The deputy stopped Qualls's automobile and administered a breathalyzer test, which showed that Qualls's blood alcohol level exceeded .10%. Qualls pleaded guilty to the offense of driving under the influence and was sentenced to forty-eight hours in jail and eleven months, twenty-nine days of probation. Second, on November 8, 1997, a Perry County Sheriff's Deputy arrested Qualls for the aggravated assault of his wife. The deputy observed that Qualls was intoxicated at the time of arrest and would have testified that Qualls resisted arrest and attempted to flee from arresting officers. Qualls pleaded guilty to the offense of aggravated assault and was sentenced to thirty days in jail and was ordered to attend Alcoholics Anonymous meetings. The trial court ruled that this evidence was not relevant. We agree.

■ Generally, the admissibility of evidence is within the sound discretion of the trial court. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn. 1992). The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion. *Id.* A trial court abuses its discretion "only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.' " *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001) (quoting *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn.1999)).

■ In personal injury actions, damages primarily compensate the wronged party for his or her injuries and are intended to make the wronged party whole. *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 703 (Tenn.Ct.App.1999). Loss

of earning capacity is an element of damages in personal injury actions, *see id.* (citing *Wolfe v. Vaughn,* 177 Tenn. 678, 152 S.W.2d 631, 635 (1941)), as is the injured party's future medical expenses, *see Newman v. Aluminum Co. of Am.,* 643 S.W.2d 109, 111 (Tenn.Ct.App.1982). As such, evidence relating to either of these elements would be relevant in a personal injury action.[3]

Qualls's prior alcohol-related convictions, however, clearly are not relevant to his loss of earning capacity or to his future medical expenses. Qualls's occupation did not involve driving, and there was no contention that Qualls drank alcohol during working hours or that his use of alcohol affected his ability to perform competently at work. In addition, the proffered evidence of Qualls's prior convictions would not be relevant to determine the amount of future medical expenses he would require over his expected lifetime. In contrast, Qualls's alcohol consumption leading to his admission to Vanderbilt clearly was relevant. The jury heard a considerable amount of evidence related to Qualls's alcoholism. This evidence was properly admitted to show the medical treatment Qualls received that was related to his alcohol withdrawal and to support Vanderbilt's theory that Qualls suffered a catastrophic event caused by his alcohol withdrawal.

■■■■■ Vanderbilt asserts that Qualls's prior convictions involving his use of alcohol are relevant because they show the pecuniary value of his life. Vanderbilt contends that we should rely upon wrongful death cases that address the pecuniary value of the life of a decedent because the issues of a decedent's life expectancy and

loss of earning capacity are similar to that of a plaintiff who is in a persistent vegetative state. We disagree. Pecuniary value is judicially defined as a part of the incidental damages that may be recovered by the decedent's survivors to compensate them for the decedent's death. *Jordan v. Baptist Three Rivers Hosp.,* 984 S.W.2d 593, 600 (Tenn.1999). Pecuniary value takes into account all aspects of a decedent's life, including his or her services and companionship, so as to place a value on the decedent's life. *Id.* These damages are not available in a personal injury action, regardless of the medical condition of the injured party. Consequently, we conclude that the trial court did not commit reversible error by excluding the proffered evidence.

### III. Witness Exclusion

■■■■ Vanderbilt also contends that the trial court committed reversible error by excluding the testimony of Dr. John Salyer, one of Qualls's treating physicians at NHC Healthcare, and Mr. James Hutchison, a biomedical engineer who is employed by Vanderbilt. The trial court excluded this evidence in response to Vanderbilt's failure to supplement its answers to plaintiff's interrogatories pursuant to Rule 26.05(1) of the Tennessee Rules of Civil Procedure. Under this rule, "[a] party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to ... the identity and location of persons having knowledge of discoverable matters...." Tenn. R. Civ. P. 26.05(1). The court found that the plaintiff would need an additional three to six weeks to retain additional experts and

---

**3.** Rule 401 of the Tennessee Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

prepare for these "surprise witnesses." Therefore, the court concluded that witness exclusion was an appropriate sanction for Vanderbilt's discovery abuse.

 Although the Tennessee Rules of Civil Procedure do not provide a sanction for abuse of the discovery process, trial judges have the authority to take such action as is necessary to prevent discovery abuse. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn.1988); *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn.Ct. App.1981). Trial courts have wide discretion to determine the appropriate sanction to be imposed. *Strickland*, 618 S.W.2d at 501. Such a discretionary decision will be set aside on appeal only when "the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn.Ct.App. 1999) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn.Ct.App.1999)). Appellate courts should allow discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness. *White*, 21 S.W.3d at 223; *Overstreet*, 4 S.W.3d at 709.

 Excluding a witness's testimony may be an appropriate sanction for failure to supplement answers to interrogatories. *See Ammons v. Bonilla*, 886 S.W.2d 239, 243 (Tenn.Ct.App.1994); *see also Lyle*, 746 S.W.2d at 699. In determining whether such a sanction is appropriate, the trial court should consider several factors: 1) the party's reasons for not providing the challenged evidence during discovery; 2) the importance of the evidence; 3) the time needed for the other side to prepare to meet the evidence; and 4) the propriety of granting a continuance. *Lyle*, 746 S.W.2d at 699. In the present case, the trial court considered each of these factors and determined that witness exclusion was an appropriate sanction for Vanderbilt's failure to supplement its answers to the plaintiff's interrogatories. The court found that the plaintiff would need an additional three to six weeks to prepare to meet the challenged evidence and concluded that a continuance was therefore not a reasonable option. Moreover, in pronouncing its ruling, the court stated, "I could not ascertain any good reason for the delay of the disclosure." We therefore conclude that the trial court acted within its discretion by excluding the testimony of these witnesses.

IV. Testimony of Annuity Specialist

 Vanderbilt argues that the trial court erred in precluding testimony related to the cost of an annuity. Vanderbilt contends that this evidence would have assisted the jury in determining an appropriate amount of damages for future medical expenses. Generally, questions regarding the admissibility, qualifications, relevancy, and competency of expert testimony are left to the trial court's discretion, and the trial court's ruling in this regard may be overturned only if the discretion is arbitrarily exercised or abused. *McDaniel v. CSX Transp. Inc.*, 955 S.W.2d 257, 263–64 (Tenn.1997).

 In the present case, the trial court excluded the testimony of Bruce Wolfe, a structural annuity specialist, offered by Vanderbilt on the issue of damages. Vanderbilt's offer of proof indicated that Mr. Wolfe would have testified about the cost of an annuity policy that could have been purchased to ensure a stream of cash payments to cover Qualls's future medical expenses. The trial court ruled that this evidence was "too speculative."

We conclude that the trial court did not abuse its discretion by excluding this testimony. Many changing variables affect the

quote that an annuitist delivers to the jury. For instance, time limits and market factors both impact annuity rates. Moreover, an insurance company is in no way bound to the quoted rate or to its initial underwriting decision. These factors not only make the testimony as to the cost of an annuity speculative, but they also raise questions about its potential to mislead the jury. *See Gold, Vann & White, P.A. v. DeBerry,* 639 So.2d 47, 55 (Fla.Dist.Ct. App.1994). Furthermore, such testimony invites the jury to depart from its legal duty to award present cash value. *See Gusky v. Candler Gen. Hosp. Inc.,* 192 Ga.App. 521, 385 S.E.2d 698, 701 (1989); *Herman v. Milwaukee Children's Hosp.,* 121 Wis.2d 531, 361 N.W.2d 297, 306 (1984); *see also Waller v. Skeleton,* 31 Tenn.App. 103, 212 S.W.2d 690, 698 (1948) (suggesting that an award of future medical expenses must be reduced to present value). Therefore, the trial court did not err in excluding this testimony.

## V. Trial Court's Comment on the Evidence

■■■ Vanderbilt also takes issue with a comment the trial court made in ruling on an objection. During the direct examination of Ms. Fowler, Vanderbilt objected to certain questions as leading. The trial judge overruled the objection, stating that the witness is a "hostile witness" who is "changing her testimony." At the conclusion of Ms. Fowler's testimony and outside the presence of the jury, Vanderbilt objected to the court's comment.

■■■ Judges are prohibited from commenting upon the credibility of witnesses or upon the evidence in a case. *See* Tenn. Const. art. VI, § 9 (stating that "[t]he judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"). Therefore, trial judges must be "very care-

ful not to give the jury any impression as to his [or her] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles,* 767 S.W.2d 403, 407 (Tenn.1989); *see also Kanbi v. Sousa,* 26 S.W.3d 495, 498–99 (Tenn.Ct.App.2000). These restrictions apply to comments made when ruling on an objection. *Loeffler v. Kjellgren,* 884 S.W.2d 463, 474 (Tenn.Ct.App.1994).

■■■ Even though judges need to be circumspect in this area, not every comment on the evidence made by a judge is grounds for a new trial. *Kanbi,* 26 S.W.3d at 499. We must consider the trial court's comment in the overall context of the case to determine whether the comment was prejudicial. *State v. Caughron,* 855 S.W.2d 526, 536–37 (Tenn.1993). Although we agree with Vanderbilt that this comment was improper, we do not believe that it rises to the level of prejudice that would require the granting of a new trial.

First, the court's comment was directed at a small part of Ms. Fowler's testimony. The questions posed by plaintiff's counsel concerned the location of the three other witnesses at the time that Ms. Fowler returned to the CT suite. During her deposition, Ms. Fowler stated that when she returned to the CT suite Nurse Starks, Ms. Turner, and Mr. Bean were "standing around." However, at trial, she testified that they were "standing around the bed." In the context of the entire trial, which lasted approximately two weeks, any prejudicial effect that resulted from the court's comment would have been slight.

■■■ Second, at the end of the proof, the trial court charged the jury concerning its role and its function as the trier of fact. It is presumed that jurors understand and follow the court's instructions. *Memphis*

*St. Ry. Co. v. Cooper*, 203 Tenn. 425, 313 S.W.2d 444, 449 (1958); *Bass v. Barksdale*, 671 S.W.2d 476, 489 (Tenn.Ct.App.1984). The court instructed the jury that it was "the sole and exclusive judge[ ] of the credibility and believability of the witnesses in this case." The court also instructed the jury that "[t]here may be discrepancies or differences within a witness' testimony" but that "[t]his does not necessarily mean that a witness should be disbelieved." In light of these instructions, we conclude that the trial court's isolated remark did not have any prejudicial effect on the outcome of the trial.

Finally, the trial court offered to give a curative instruction with regard to its comment, but Vanderbilt refused the court's offer and failed to request a more appropriate instruction. Therefore, Vanderbilt cannot rely on the trial court's improper comment on the evidence as grounds for overturning the jury's verdict on appeal. *See State v. Griffis*, 964 S.W.2d 577, 599 (Tenn.Crim.App.1997) ("If a party fails to request a curative instruction, or, if dissatisfied with the instruction given and [sic] does not request a more complete instruction, the party effectively waives the issue for appellate purposes.").

### Conclusion

We overrule *Gray v. Ford Motor Co.*, 914 S.W.2d 464 (Tenn.1996), and hold, as a matter of law, that the principles of comparative fault do not apply in medical malpractice actions in which a patient's negligent conduct provides only the occasion for the medical attention, care, or treatment which is the basis for the action. Therefore, we conclude that the trial court properly granted the motion for judgment in accordance with the plaintiff's motion for directed verdict. We also hold that the issues raised by Vanderbilt are without merit and do not require us to grant a new

trial. Accordingly, the judgment of the Court of Appeals is affirmed in part and reversed in part, and the jury's verdict in the amount of $7,366,000 is reinstated without regard to the jury's assessment of fault to Qualls. Costs of this appeal are taxed to the appellee, Vanderbilt, and its surety, for which execution may issue if necessary.

FRANK F. DROWOTA, III, C.J., filed a dissenting opinion.

FRANK F. DROWOTA, III, C.J., dissenting.

By overruling *Gray v. Ford Motor Co.*, 914 S.W.2d 464 (Tenn.1996), a decision released only eight years ago, the majority disregards the principle of stare decisis and undermines the fairness goal of our prior comparative fault decisions. Therefore, I dissent from the majority's decision in this case. In addition, like the Court of Appeals, I believe the trial court erred by excluding evidence of Larry T. Qualls prior alcohol-related conduct and testimony of two defense witnesses and by commenting upon the credibility of a defense witness. Given the cumulative effect of these errors, Vanderbilt is entitled in my view to a new trial.

### I. Comparative Fault

Twelve years ago, this Court adopted a modified system of comparative fault and rejected the contributory negligence regime. *McIntyre v. Balentine*, 833 S.W.2d 52, 56 (Tenn.1992). The goal of *McIntyre* and all of this Court's subsequent comparative fault decisions has been achieving fairness by linking liability to fault. *McIntyre*, 833 S.W.2d at 56; *Carroll v. Whitney*, 29 S.W.3d 14, 16–18 (Tenn.2000) (discussing prior cases). This Court's decision in *Gray* was entirely consistent with that fairness goal and need not be overruled to resolve the issue in this appeal.

In *Gray,* the plaintiff's decedent negligently crashed her car into a utility pole while under the influence of alcohol. 914 S.W.2d at 465. At the emergency room, a physician evaluated and examined the decedent, and her condition appeared to improve. The physician left the emergency room to attend to other duties. Immediately after the physician's departure, the decedent's condition became critical when her blood pressure dropped to a dangerously low level. One hour later, the physician surgically removed the decedent's ruptured spleen, but the decedent later died. The cause of death was listed as a "ruptured spleen" suffered in an automobile accident. *Id.* at 465–66. The plaintiff brought a wrongful death action, claiming that the decedent's death had been proximately caused by the physician's negligence in treating the decedent's injury. *Id.* at 465. This Court held that fault may be apportioned between a patient who acts negligently in causing his or her initial injury and a physician who acts negligently in diagnosing or treating the patient for that injury. *Id.* at 467. However, consistent with the underlying fairness aim of our adoption of comparative fault, *Gray's* holding was limited to cases in which the separate, independent acts of the patient and the physician proximately cause one, indivisible injury. *Id.* at 465. Indeed, this Court emphasized *Gray's* limitation, stating: "[t]his case does not present, and the Court declines to address in this opinion, the rights and liabilities of the parties where there are multiple, separate injuries." *Id.*

The instant appeal presented this Court with an opportunity to answer the issue reserved in *Gray*—how do comparative fault principles apply in medical malpractice cases involving multiple, separate injuries? In my view, the answer to this question is not difficult. Fairness mandates that fault not be compared if the separate, independent acts of the patient and the physician result in multiple, divisible injuries. In other words, fault should not be apportioned between a patient whose negligence causes an initial injury and a physician whose negligent diagnosis or treatment causes additional, divisible injuries. Indeed, any other holding would defeat *McIntyre's* seminal aim of linking liability with fault. In short, whether a patient's negligence caused the need for hospitalization in the first place is not determinative if a physician's negligence causes one or more additional divisible injuries.

In this case Larry T. Qualls's negligence caused an automobile accident in which he sustained a concussion and multiple facial fractures. While Mr. Qualls's negligence caused the need for hospitalization at Vanderbilt, the record reflects that the facial fractures Mr. Qualls sustained in the accident had been properly repaired and had properly healed by the time of trial. No evidence indicates that Mr. Qualls sustained a serious brain injury in the automobile accident. Indeed, undisputed facts indicate that Mr. Qualls sustained the separate brain injury nearly four days after being admitted to Vanderbilt. The plaintiff alleged that medical malpractice on the part of Vanderbilt's employees caused this injury. What is relevant to this appeal is the fact that Mr. Qualls sustained separate, divisible injuries. Accordingly, Mr. Qualls's initial negligence resulting in the automobile accident and his need for hospitalization may not be compared with the subsequent negligence, if any, of Vanderbilt's employees. This conclusion is consistent with *Gray* and with the fairness aim of our prior comparative fault decisions.

In contrast, the majority's decision undercuts the fairness aim of our prior decisions. The majority decision shields from liability a plaintiff whose negligence com-

bines with the negligence of a physician to cause an indivisible injury. Such a result is entirely inconsistent with the notion of linking liability to fault. Moreover, as my analysis illustrates, *Gray* poses no hurdle to resolving this case. Indeed, this appeal presents for decision the very issue expressly reserved in *Gray*. The majority's determination to disregard the principle of stare decisis and overrule a recent decision therefore is both troubling and inexplicable.

Although I have concluded that Mr. Qualls's initial negligence should not be compared with the subsequent medical malpractice, if any, of Vanderbilt's employees, I agree with the Court of Appeals that Vanderbilt is entitled to a new trial because the trial court erred in excluding evidence of Mr. Qualls' prior alcohol-related conduct and the testimony of two defense witnesses and in commenting upon the credibility of a witness. As the Court of Appeals pointed out, the culmination of these errors deprived the defendant of a fair trial.

## II. Exclusion of Defense Witnesses

During pretrial discovery, the plaintiff, Mr. Qualls's conservator, served standard interrogatories on Vanderbilt seeking "the identity of each person who may have knowledge of the facts in this case." In its original response Vanderbilt did not provide the names of either Dr. John Salyer, one of Mr. Qualls's treating physicians, or James Hutchison, a biomedical engineer. Vanderbilt did not later supplement its original interrogatory response to provide their names. However, when both parties exchanged witness lists five days before trial as required by the local court rules, Vanderbilt disclosed that it intended to call both Dr. Salyer and Mr. Hutchison as witnesses.

The plaintiff moved to exclude Dr. Salyer's and Mr. Hutchison's testimony on the grounds that Vanderbilt had failed to disclose their identities in response to pretrial discovery. The trial court excluded these two witnesses as a remedial measure for Vanderbilt's failure to disclose their identities during pretrial discovery. In so doing, the trial court stated that Mr. Hutchison's proposed testimony "would be central to this case and would be a surprise to the plaintiff if it was presented now." The trial court reached the same conclusion about Dr. Salyer's testimony and compared allowing both men to testify to "trial by ambush." Ultimately the trial court excluded Dr. Salyer from testifying because he was not identified and disclosed by Vanderbilt "in a timely fashion."

Although the Tennessee Rules of Civil Procedure do not provide a sanction for abuse of the discovery process, trial courts have inherent authority to take corrective action to remedy discovery abuse. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988) (discussing expert witnesses); *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn.Ct.App.1981) (discussing fact witnesses). In certain circumstances, excluding the testimony of a witness may be an appropriate sanction for failure to name the witness. *Id.* However, this Court has noted that "other sanctions may be appropriate where the failure to name ... [the] witness is not knowing and deliberate." *Lyle*, 746 S.W.2d at 699. In deciding on an appropriate sanction for discovery abuse, trial courts should consider these factors: (1) the party's reasons for not providing the challenged evidence during discovery; (2) the importance of the evidence to the case; (3) the time needed for the other side to prepare to meet the evidence; and (4) the reasonableness of granting a continuance. *Id.* Once the trial court has determined an appropriate sanction, appellate courts review that decision

under an abuse of discretion standard. *Brooks v. United Uniform Co.*, 682 S.W.2d 913, 915 (Tenn.1984); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn.Ct.App. 1999). Under that standard appellate courts must consider: (1) whether the factual basis for the decision is supported by the evidence; (2) whether the trial court identified and applied the applicable legal principles; and (3) whether the trial court's decision is within the range of acceptable alternatives. *White*, 21 S.W.3d at 223. Appellate courts ordinarily permit discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn.Ct. App.1999).

### A. Dr. Salyer's Testimony

While the plaintiff may have viewed Dr. Salyer as a "surprise witness," I am not convinced that Vanderbilt abused the discovery process in how it handled Dr. Salyer. Indeed, a stronger argument can be made that Dr. Salyer's late identification resulted from the plaintiff's failure to fully respond to interrogatories. Vanderbilt propounded the following interrogatory:

> Identify all health care providers, including all psychiatrists, psychologists, or therapists who have examined, treated or consulted in the care and treatment of Larry Qualls for the past ten years and state: (a) the name and address of the employer of each health care provider identified; (b) the date or dates of treatment or examination performed by each health care provider; and (c) the nature and purpose of the treatment or examination performed by each health care provider.

Even though Dr. Salyer had treated Mr. Qualls's at NHC nursing home since the summer of 1998, following Mr. Qualls's discharge from Vanderbilt, the plaintiff failed to mention Dr. Salyer or any other health care provider at NHC in her February 1999 response to this interrogatory. Nonetheless, during pre-trial discovery, the plaintiff provided Vanderbilt with Mr. Qualls's NHC medical records, and Vanderbilt learned of Dr. Salyer from reviewing these medical records, which were replete with clinical notes prepared by Dr. Salyer. Keying in on those notes, Vanderbilt interviewed Dr. Salyer and decided to call him as a witness on several issues including: (1) whether Mr. Qualls would receive better care in a nursing home or in a private home; (2) whether Mr. Qualls is currently in a persistent vegetative state; and (3) whether Mr. Qualls will benefit from some of the products and services proposed by the plaintiff's life-care plan expert, Dr. Terry Winkler. Dr. Sayler's testimony would have rebutted the testimony from witnesses for the plaintiff that criticized the care provided Mr. Qualls at the NHC facility and that opined Mr. Qualls would be better cared for in a home setting. Indeed, Dr. Salyer would have testified that Mr. Qualls remained in a persistent vegetative state, that the NHC facility provided good care, that the nursing home would be the best setting for Mr. Qualls, that Mr. Qualls requires access to a physician twenty-four hours a day, that he would not have had such access in a home setting, and that, had the family attempted to discharge him to a home setting, the discharge would have been against his medical advice. Clearly, this testimony is relevant to damages. The difference in the cost of care at NHC versus the cost of care in a home setting, as advocated by plaintiff's expert, was approximately $238,967 per year. Had the jury heard the opinions of Dr. Salyer—a witness who had not been paid by either party to this lawsuit and who had actual experience treating Mr. Qualls—it could very well have

chosen a different, lower figure for part of the damages.

As the Court of Appeals pointed out, the plaintiff knew about Dr. Salyer before trial and knew that he had knowledge of Mr. Qualls treatment and care. Indeed, the plaintiff, rather than Vanderbilt, failed to disclose Dr. Sayler's identity in response to an interrogatory. Therefore, even assuming Vanderbilt violated the discovery rules with respect to Dr. Sayler's testimony, an assumption that is far from clear, I have no hesitation in concluding that the trial court erred by altogether prohibiting Dr. Salyer's testimony. There is certainly no evidence that Vanderbilt knowingly and deliberately violated the discovery rules. In the absence of proof that a litigant knowingly or deliberately withheld the identity of a witness, trial courts should rarely if ever altogether preclude the witness from testifying.

### B. Mr. Hutchison's testimony

While the situation with Mr. Hutchison is not as straightforward, I again conclude that the trial court erred in precluding his testimony. Regarding the cause of Mr. Qualls's brain injury, the plaintiff presented evidence and argued that the oxygen connected to the ventilator ran out, that the alarms on the ventilator either were not operating, were not heard, or were ignored, that the alarms on the cardiac monitor had not been appropriately set, were not operating, were not heard, or were ignored, that after the incident Vanderbilt failed to retrieve from the cardiac monitor information about Mr. Qualls's vital signs at the time of the incident, and that Mr. Qualls's brain injury resulted from one or more of these failures. To counter this theory, Vanderbilt intended to call Mr. Hutchison, who had checked all of the equipment, including the ventilator, involved in Mr. Qualls's CT scan within a few days after Mr. Qualls sustained the serious brain injury. The trial court refused to allow Mr. Hutchison to testify because Vanderbilt had not disclosed his name during pre-trial discovery.

Vanderbilt presented an offer of proof to preserve for appeal Mr. Hutchison's testimony, had he been allowed to testify. In particular, counsel for Vanderbilt stated that Mr. Hutchison would have provided the following testimony:

First of all, on the subject of the [cardiac] monitor that is on the table here in front of us, he would testify that this particular monitor is the one used on Mr. Qualls on the evening of June 2nd 1998; that it was immediately taken to his department and it was checked out the following few days to determine whether it was in working order, and to determine whether its alarms worked and what the parameters were, that it checked out to be okay in every respect; that it operated in accordance with the manufacturers' operating manual; that the parameters on it were set within the norms they are usually set; and that there was nothing out of the ordinary about the heart rate parameters, the oximeter parameters, or any other parameters that he found.

He would testify that it is a Hewlett Packard model. He would testify that—in regard to its ability to record and maintain a written record of an electro-cardiogram strip, as it has been referred to here; that it required that a module or a cartridge, as it has been referred to in this case, be plugged into this unit before such a reading is to be taken; that when he got this machine in his department following, there was no such cartridge or module in it. This machine does not have the capability of recording the information in its body without that module or cartridge such that can be

retrieved later on a strip to keep a record of the electrocardiogram information.

They checked the alarms, the alarms were not discernible, the alarms were in working condition. The alarms worked on the suspend mode such that a red light illuminates when it is suspended, as well as a black envelope or window opens on the screen in which are the words "Alarms Off" written.

He would testify that the second method in which alarms can be disabled is to push a button and silence them; that when the silence button is utilized on this model, its silence is only for a period of three minutes. That is a period of time that is set at the factory and cannot be changed by Vanderbilt or its personnel; that the silence mode and the three-minute delay were in working order when they examined them; that when Silence is pressed, there, nevertheless, continues to be a flashing signal on the screen to the effect that the alarm is occurring.

With regard to the second piece of equipment, the ventilator, he would testify that the ventilator, before the Jury, is the one that was used on Mr. Qualls on June 2nd, 1998; that it, too, was checked by service technicians at Vanderbilt University Medical Center and that it was found to be in working order completely in accordance with the manufacturers's specifications, that the parameters on it were properly set, the alarms were properly functioning, and the machine was functioning normally.

In regard to the alarms on the ventilator, Mr. Hutchison will testify and demonstrate that there are several alarms, one of which is the disarm alarm and that the disarm alarm will come on and signal when the machine is started up if that alarm is not in the On position. It will also signal an alarm if, while the machine is running, that alarm is intentionally or inadvertently turned off.

The second alarm he would testify about is the low pressure alarm, and it is in working order and was that night on this machine, and it alarms if there's a disconnect or a low pressure signal in the device in regard to its providing oxygenation to the patient.

He would testify that there is a high pressure alarm and that pressure alarm was also in working order and it signals if there's a high pressure outside the normal parameters, and that they were properly set.

He would testify also that there is an oxygen depletion alarm on this set that was in working order and that it signals the following alarms:

That when the source gas, that is to say the oxygen, begins to get a low pressure at around 50 psi, that an alarm goes off and intermittently sounds with each respiratory breath for approximately two to four minutes before the oxygen is depleted, and that as the oxygen pressure gets lower, the alarm becomes more intense. And when the oxygen pressure is depleted, there gets to be another alarm of oxygen depleted.

That's what Mr. Hutchison would testify about if he were permitted to testify, if the Court please.

In determining whether to permit Mr. Hutchison's testimony, the first question is whether, during discovery, Vanderbilt advised the plaintiff that Mr. Hutchison had knowledge of the facts of this case. The plaintiff did not dispute that on April 26, 1999, her lawyer, her lawyer's nurse consultant, and defense counsel met Mr. Hutchison face-to-face to allow the plaintiff's lawyer to interview him about the alarm system on the CT scan monitor and ventilator. Although Mr. Hutchison did

not have personal knowledge of the actual events of Mr. Qualls's June 2, 1998 CT scan, he had examined the monitors after the incident and knew how the alarms on the monitors normally function and in particular how the ventilator would have alarmed had it run out of oxygen. The plaintiff's attorney knew the scope of Mr. Hutchision's knowledge and that Mr. Hutchison proposed to testify about that knowledge at trial. The plaintiff had a free and clear opportunity while meeting with Mr. Hutchison to find out everything Mr. Hutchison knew about the cardiac monitor and the ventilator. There is no evidence that Vanderbilt in anyway concealed from the plaintiff Mr. Hutchison identity or his knowledge of relevant facts.

In excluding Mr. Hutchison's testimony, the trial court was influenced by what it called "the strange letter and agreement" between opposing counsel regarding taking discovery from Mr. Hutchison and biomedical engineers generally. During pre-trial discovery, plaintiff's counsel asked opposing counsel if he, along with his client and a nurse consultant, could meet with someone at Vanderbilt who could demonstrate how the portable cardiac monitor and portable ventilator worked. Defense counsel wrote plaintiff's counsel on April 23, 1999, just prior to the commencement of depositions, informing him that Vanderbilt would make available to him someone to answer all the questions he had about the equipment, but only if he agreed not to depose any other biomedical engineer throughout the pendency of the case. The letter stated, "If you change your mind or you do not think this adequately sets forth our understanding, please notify me immediately." There is no evidence indicating that plaintiff's counsel objected to this arrangement, and as previously stated, plaintiff's counsel subsequently interviewed Mr. Hutchison. Nonetheless, when asking the trial court to exclude Mr. Hutchison's testimony, plaintiff's counsel asserted that he would have deposed Mr. Hutchison had he known Vanderbilt intended to call Mr. Hutchison to testify at trial.

It is important to remember that Tenn. R. Civ. P. 26.02(1) allows parties to discover the identities of persons having knowledge about the facts of a case, but the rule does not require a party to designate its trial witnesses. Vanderbilt complied with its obligation to identify Mr. Hutchison, and Vanderbilt complied with Rule 29 of the Local Rules of Practice for Davidson County by designating Mr. Hutchison a trial witness. Notwithstanding the trial court's characterization of the lawyers' agreement as "an implied promise that the biomedical engineer would be available for information but would not be used at trial," Vanderbilt simply never informed the plaintiff that Mr. Hutchison would not testify at trial. Thus, in my view, the trial court erred in excluding Mr. Hutchison's testimony.

Furthermore, this error was not harmless. As Vanderbilt points out, while there was testimony that an alarm sounds on the ventilator when the oxygen supply is totally depleted, no other witness offered testimony about the two to four minute intermittent alarm attached to the ventilator which sounds when the oxygen supply is running low. No other witness testified that the intermittent alarm sounds more and more frequently as the oxygen supply is depleted or that another alarm sounds when the oxygen is totally depleted. Additionally, no other witness testified that the portable cardiac monitor was not capable of printing out a cardiac rhythm strip. In addition, Mr. Hutchison was the only witness who could have fully explained how the medical equipment and alarms functioned. The jury could have weighed Mr. Hutchison's testimony against the plain-

tiff's theory that three people—the attending nurse, the attending respiratory therapist, and the attending CT technologist—failed to hear or ignored all these alarms and took no action to protect Mr. Qualls. I conclude that the trial court excluded Mr. Hutchison's testimony on erroneous grounds and that this error was not harmless because his testimony was not merely cumulative evidence.

### III. Exclusion of Mr. Qualls's Alcohol–Related Conduct

I also believe the trial court erred by excluding "all evidence of Mr. Qualls's alcohol-related conduct, including conviction for driving under the influence, aggravated assault and associated jail time." In particular, the trial judge refused to admit as irrelevant proffered testimony that Mr. Qualls drove a motor vehicle on April 13, 1996 [two years before he was injured] while intoxicated and accompanied by his children; that his blood alcohol exceeded .10 percent; that he pleaded guilty and was sentenced to jail; that in 1997 he was charged with assaulting his wife while intoxicated and resisting arrest to which he pleaded guilty.

I believe the excluded evidence of alcohol-related conduct was highly relevant to the issue of causation of Mr. Qualls's brain injury. Vanderbilt's theory was that Mr. Qualls's brain injury had not been caused by negligence but had been caused by a malignant cardiac arrhythmia, a symptom of delirium tremens Mr. Qualls had experienced as a result of his withdrawal from alcohol. The plaintiff elicited testimony from its experts that Mr. Qualls had not been an alcoholic and had not been suffering delirium tremens. Vanderbilt sought to cross-examine these witnesses, Dr. Rodney Folz and Dr. Barry Shaw, by questioning them about their knowledge of Mr. Qualls's prior alcohol-related conduct. Re-

ferring to this evidence prior to trial, the trial judge stated: "if [plaintiff's counsel] attempts to say that alcohol was not in the blood system of Mr. Qualls or *that he did not have an alcohol problem* or that—various things that he might bring up, that you would be allowed to ask again—revisit that issue in rebuttal form." Despite the plaintiff's evidence aimed at convincing the jury that Mr. Qualls had not been an alcoholic and had not been suffering from delirium tremens, the trial judge refused to allow Vanderbilt to offer countervailing evidence of Mr. Qualls's prior alcohol-related conduct. In doing so, the trial judge erred, and this error was not harmless when considered in conjunction with the other errors that occurred in this trial.

### IV. Comment on the Evidence

In my view, the trial court also erred by improperly commenting upon the evidence. Article VI, section 9 of the Tennessee Constitution provides that, "The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." Trial judges must be "very careful not to give the jury any impression as to his [or her] feelings or to make any statement which might reflect upon the weight or credibility of evidence which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn.1989); *State v. Eaves*, 959 S.W.2d 601, 605 (Tenn. Crim.App.1997). While not every comment on the evidence by a judge in a jury proceeding is per se grounds for a new trial, when evaluated in conjunction with the other errors, the comments of the trial judge in this case were prejudicial.

The evidence at issue is the testimony of Ms. Fowler, the patient care partner assigned to Mr. Qualls on the evening of June 2, 1998. Ms. Fowler had been responsible for taking Mr. Qualls to the CT suite where the brain injury from oxygen

deprivation occurred. Ms. Fowler had left the CT suite to get new linens for Mr. Qualls and returned after the scan had been completed. The relevant questioning of Ms. Fowler and the trial court's comment were as follows:

Q. All right. And now tell the Jury what you saw when you came back. And I assume that you had gone to get the linens?

A. Yes.

Q. And can you remember how long it was that it took you to do that?

A. I do not know.

Q. Well, I mean, tell us what you did. Did you just go up to the floor and grab the linen and come straight back down?

A. Yes.

 \* \* \* \* \* \*

Q. When you came back down, was the scan over?

A. I do not remember that.

Q. Do you remember telling me in your deposition that it was?

A. Okay. I'm sorry. If—what I remember was that everyone was in the scan room itself, standing around the bed when I came back.

Q. All right. In fact, you told me that everybody was—when you came back, was standing around. Isn't that what you said?

A. They were standing around the bed.

Q. All right. Let me just—I'm—

A. I'm sorry.

Q. Let me show you, Ms. Fowler, what you said when I took your deposition back in May. It's Page 24. And let's see if you still remember it that way today. Line 12.

A. Line 12.

Q. You see where I asked you, "Tell me what you saw when you came back; you said the scan was over?"

A. Yes.

Q. And your answer is what?

A. "Everyone was standing around." When I said that, sir, I meant around the bed.

Q. I know, but you remember me asking you in the beginning to tell me, answer my question to the best of your knowledge and information, remember that?

A. (Witness moves head up and down.)

Q. And I think I asked you two or three times if the people were standing around, and you never did tell me they were standing around the bed, you said "standing around"?

A. I'm sorry.

Q. Do you wish to change that in some way?

A. What—when I said "standing around," the way the control room is set up—not the control room— excuse me—the CT room is set up, it is set up so that there is room on one—both sides of the bed to stand. And when the patient, the person, medical personnel was there, there was someone at the head of the bed, on both sides, and one at the foot.

Q. On this—

A. —I'm sorry. Go ahead.

Q. I'm sorry. I thought you were through.

 \* \* \* \* \* \*

Q. Finish, please.

A. What I remember from that was that the CT scan operator, Wayman, was standing at the foot of the bed which would have said both the respiratory therapist and the nurse

were at the head of the bed. I didn't mean standing around such as milling around. They were standing around the bed.

Q. When I asked you that again, because I was really under—you know, I wanted to make sure. So at Line 21, I said to you, "And you say everybody was standing around; where were they"—excuse me. Because I want to make sure when I asked you that question, "In the back where the table part was?"

And you said, "Back where the CT scanner is, yes."

And then I said, "Okay, they were back in where Mr. Qualls was."

And you said, "Yes."

And I said, "And they were standing around?"

And you told me again, "Yes."

A. They were standing around him.

Q. Because they were waiting on you to come back with the linens—

A. Yes.

Q. —to change the bed, weren't they, Ms. Fowler?

A. Yes.

Q. That's why you went up there. Everybody knew. In fact, you had to ask Ms. Starks if it was all right for you to leave to do that?

A. Yes.

Q. They were all standing around waiting for you to bring the linens back to change Mr. Qualls' linen.

DEFENSE COUNSEL: Objection to the leading, Mr. Kelly is leading and he doesn't have a right to.

THE COURT: Overruled because I'll rule this witness is a hostile witness, *changing her testimony from*—[emphasis added]

THE WITNESS: I'm sorry.

PLAINTIFF'S COUNSEL: Let me rephrase it, Your Honor.

THE COURT: All right.

PLAINTIFF'S COUNSEL:

Q. What was the reason that the people were standing around, waiting for you to come back?

A. It normally takes four people to move a patient from the bed to the scanner.

Q. So they were waiting for you to come back to help them move from table to bed?

A. Yes.

Q. Somebody knew you had gone to get linen to change the bed, is what—

A. Yes.

Q. And when you came back, that's what you thought they were waiting on?

A. Yes.

No matter the intent, the trial court's comment sounded like an appraisal of Ms. Fowler's credibility.[2] To a reasonable jury, the trial court's remark, coming when it did, could have signaled that the trial court thought the witness was trying to "change" her testimony at trial to make it more favorable to Vanderbilt than it originally had been. Given that the plaintiff was proceeding on a theory that the oxygen tank on Mr. Qualls's ventilator had

---

**2.** In a discussion with counsel outside of the jury's presence immediately after Ms. Fowler's testimony, the court told the lawyers: "I think she committed blatant perjury." While my knowledge of the proceeding is limited to the written record, I am unable to detect any hostility on Ms. Fowler's part. Nor am I able to glean from the questions and answers any significant divergence between Ms. Fowler's testimony at trial and her deposition testimony.

run out of oxygen during the CT scan and that Vanderbilt was trying to cover up that fact, this comment was significant. Therefore, the credibility of Vanderbilt's employees was an important issue in the case. Indeed, the plaintiff's counsel argued to the jury that, "[t]his case is all about credibility," and "[t]hat's their story, [a]nd I'll ask you [the jury] to tell us when you come back whether you think that's credible or not." The plaintiff implied that Vanderbilt was covering up what really happened to Mr. Qualls, saying that the alarm on the ventilator failed to sound because it had been disengaged, "[b]ut they're not going to tell you that, because that's bad...." The truthfulness issue was so central to the case that Vanderbilt's lawyer spent the first part of his closing argument trying to debunk any cover-up theory. He suggested to the jury that it would be an extreme notion that all the medical personnel "were lying."

When considered in the context of this case, the trial court's comment on Ms. Fowler's credibility was not harmless. Furthermore, I am unable to agree with the Court of Appeals's conclusion that Vanderbilt waived this issue by refusing the trial court's offer of a curative instruction. As Vanderbilt points out, the trial court offered to provide a "curative instruction" that actually re-emphasized the improper comment, stating:

> [M]y one comment about allowing [plaintiff's counsel] to further examine and lead the witness *who had changed her testimony from the deposition to the trial* was exactly that. I was explaining why I was allowing him to lead *because of the change in her testimony.* It was not commenting on her truthfulness. Would you like me to explain that to the Jury?

(Emphasis Added.) In this instance, the offered curative instruction clearly would have exacerbated the error. Furthermore, had the trial judge phrased the curative instruction without referring to a "change in testimony," any further statement by the trial judge would have certainly reminded the jury of the initial comment, again exacerbating the error. In the context of this case, where credibility of the eyewitnesses to the event was of paramount importance and where other errors occurred during the trial, a curative instruction would not have been sufficient. Accordingly, this error combined with the other errors outlined above to deprive Vanderbilt of a fair trial.

### V. Conclusion

For all these reasons, I dissent from the majority's decision and would grant Vanderbilt a new trial. Because I believe a new trial is necessary on other grounds, I would reserve for another day the issue of first impression: whether an annuitist's testimony is admissible in a personal injury case in Tennessee.